**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **BRENDA ALTHOUSE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12-cv-21-TLW** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Plaintiff Brenda Althouse seeks judicial review of the decision of the Commissioner of

the Social Security Administration, denying her claim for Disability Insurance Benefits (SSDI)

and Supplemental Security Income benefits (SSI) under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3)(A). In accordance with 28 U.S.C. § 636(c)(1) &

(3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 13).

Any appeal of this decision will be directly to the Tenth Circuit.

Plaintiff filed an application for SSDI and SSI on June 29, 2009 alleging a disability

onset date of September 5, 2007. (R. 137-140). After a hearing on August 23, 2010, the ALJ

ruled against plaintiff on September 22, 2010. (R. 14-25, 31). Plaintiff filed a request for review,

which the Appeals Council denied on November 17, 2011. (R. 1). The decision of the Appeals

Council represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§

404.981, 416.1481. On January 19, 2012 plaintiff filed the subject action with this Court. (Dkt. #

2).

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

**Introduction**

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750-752 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence, and whether the decision contains a sufficient basis to determine that the Commissioner has applied

the correct legal standards. <u>Grogan v. Barnhart</u>, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Id.</u> The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." <u>Id.</u> at 1262. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. <u>See</u> <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. <u>White v. Barnhart</u>, 287 F.3d 903, 908 (10th Cir. 2002).

**<u>Background</u>**

### A.  Medical History

At the time of the ALJ's decision, plaintiff was forty-nine years old, had a high school diploma, and had attained some college credits. (R. 35). On September 27, 2007, plaintiff saw Gregory Brooks, D.O., who reported a positive straight leg raising test in the right supine position; decreased range of motion of lumbar in all planes with pain; and positive pain on palpation at L3, L4, L5, the sacral area, and sciatic area on the right paraspinous area. (R. 266-267). X-rays were negative for abnormalities, and Dr. Brooks assessed plaintiff with lumbar strain, sacrum strain, and sciatica. Dr. Brooks restricted plaintiff from lifting over 10 pounds; pushing or pulling over 10 pounds of force; squatting; kneeling; and climbing of stairs or ladders. (R. 267). On December 3, 2007, Dr. Brooks conducted a follow-up exam of plaintiff with almost identical results. (R .269-270).

On December 3, 2007, plaintiff saw Kenneth Trinidad, D.O., in connection with a worker's compensation claim. Dr. Trinidad reported tenderness and spasm in plaintiff's lumbar spine from L5 through S1 bilaterally with particular tenderness over the right sacroiliac joint. (R. 278-281). Neurological examination revealed deep tendon reflexes to be symmetric, and Dr. Trinidad assessed plaintiff with a lumbar spine injury with right leg radiculitis. (R. 279). On July 28, 2008, Dr. Trinidad reported similar test results after examining plaintiff. (R. 276-277). Dr. Trinidad opined that plaintiff was temporarily totally disabled and that she should be re-evaluated by orthopedic spinal surgeon, Dr. Randall Hendricks, who had previously seen plaintiff in connection with the same worker's compensation claim. (R. 276).

On April 7, 2008, plaintiff saw consultative examiner Dr. Hendricks in connection with the same worker's compensation claim. Dr. Hendricks reviewed an MRI that revealed mild degenerative disc disease of the lumbar spine with moderate facet joint arthrosis and L4-L5 mild bilateral foraminal stenosis and left posterolateral disc high intensity zone. (R. 282). Dr. Hendricks noted that plaintiff's strength was fairly well maintained, her sciatic stretch test was mildly positive, she had a discrepancy in her pelvic alignment, and a slight narrowing of L5-S1. (R. 285). Dr. Hendricks assessed plaintiff with chronic right L5 radiculitis. Id. An April 16, 2008 follow-up visit with Dr. Hendricks revealed spondylotic changes at L4-5 on the left and a small annular disruption, which possibly produced a chemical leakage around the nerve that could produce an L5 radiculitis. (R. 287). Dr. Hendricks performed a lumbar epidural steroid injection and encouraged plaintiff to exercise. Id. On May 16, 2008, after another follow-up examination, Dr. Hendricks recorded that plaintiff did not have any hard deficit and recommended a water therapy program, a home exercise program, and increased walking. (R. 288). On October 20, 2008, Dr. Hendricks recommended that plaintiff undergo a lumbar discogram to see whether or

not the L4-5 disk was the pain generator. (R. 290). On October 23, 2008, he completed a form indicating that plaintiff should not lift over 30 pounds and should not perform excessive bending and twisting. (R. 292).

On June 12, 2008, plaintiff saw David Ring, M.D., with complaints of headache and shoulder pain. (R. 296). Dr. Ring ordered a CT scan of the brain and cervical spine x-rays which were later reported negative for abnormalities by Richard Knepper, M.D. (R. 296, 306-307). After a visit on September 17, 2008, Dr. Ring diagnosed plaintiff with panic disorder and prescribed Hydroxyzine for anxiety. (R. 295). On November 19, 2008, plaintiff saw Dr. Ring to report diffuse pain. Id. Dr. Ring opined that he suspected plaintiff had fibromyalgia. Id. On July 21, 2009, Dr. Ring completed a fibromyalgia tender points chart which indicated plaintiff to be positive for 17 of 18 tender points. (R. 310). On December 16, 2009, Dr. Ring assessed plaintiff with chronic pain, the sources of which he determined came from fibromyalgia, lumbar disc disease with sciatica, and insomnia. (R. 343). Dr. Ring noted that plaintiff's symptoms were quite disabling, and that he was going to treat her fibromyalgia with Savella. Id.

Also on December 16, 2009, Dr. Ring completed a Medical Source Statement-Mental, indicating that plaintiff had moderate limitations in her ability to remember locations and work-like procedures and in her ability to remember very short and simple instructions. (R. 375-376). Dr. Ring further indicated that plaintiff had marked limitation in her ability to remember and understand detailed instructions. (R. 375). However, Dr. Ring indicated she had no limitation in carrying out either simple or detailed instructions, or in maintaining attention and concentration for extended periods. Id. On February 4, 2010, Dr. Ring diagnosed plaintiff with fibromyalgia and right shoulder pain. (R. 342). The same day, Dr. Ring completed a Medical Source Statement-Physical, (R. 348-349), indicating that plaintiff could frequently lift and/or carry less

than 5 pounds; occasionally lift and/or carry 5 pounds; stand and/or walk continuously for less than 15 minutes; stand and/or walk for 1 hour throughout an 8-hour workday with normal breaks; sit continuously for less than 15 minutes; sit for 2 hours throughout an 8-hour workday with normal breaks; occasionally push and/or pull due to neck or shoulder pain; never climb, balance, or crawl; occasionally stoop, kneel, crouch, reach, handle, and finger; should avoid moderate exposure to environmental factors; and required lying down or reclining every 3 hours for 20 minutes at a time. Id. On March 29, 2010, plaintiff saw Dr. Ring about experiencing side effects with hydrocodone. (R. 378). Dr. Ring prescribed Lyrica for her fibromyalgia pain and Alprazolam as needed for panic attacks. Id.

On June 23, 2008, plaintiff saw Victor Palomino, D.O., who diagnosed plaintiff with left shoulder pain impingement with partial rotator cuff tear. (R. 304). Dr. Palomino discussed treatment options of physical therapy, anti-inflammatory medication, and a steroid injection versus surgery. (R. 301).

On September 19, 2009, plaintiff saw consultative examiner Johnson Gourd, M.D. (R. 311-317). Plaintiff tested positive on 18 out of 18 points during a fibromyalgia test, to which Dr. Gourd noted that he felt plaintiff's reaction to be slightly exaggerated. (R. 313). Plaintiff had normal range of motion in her neck, hips, legs, shoulders, arms, and hands, and showed no muscle atrophy. (R. 314-317). Dr. Gourd's impression included history of fibromyalgia, back pain from disc abnormality at L4-5, and depression. (R. 313-317). Dr. Gourd also noted plaintiff had hypertension, which seemed to be adequately controlled by her medications, and hyperlipidemia. (R. 313).

On October 13, 2009, state agency doctor Sally Varghese, M.D., completed a Psychiatric Review Technique. (R. 320-333). She opined that plaintiff had a history of depression and panic disorder but that her mental impairments were not severe. Id.

On October 21, 2009, another state agency medical doctor, Luther Woodcock, M.D., completed a residual functional capacity (RFC) assessment, indicating that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk at least 2 hours in an 8-hour workday; sit with normal breaks for about 6 hours in an 8-hour workday, and was unlimited to push and/or pull. (R. 334-341).

On March 4, 2010, state agency medical doctor Janet Rodgers, M.D., a state agency medical consultant, completed an RFC assessment, indicating that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk at least 2 hours in an 8-hour workday; sit with normal breaks for about 6 hours in an 8-hour workday; push and/or pull without limitation; occasionally climb, stoop, kneel, and crouch; and never climb ladders/ropes/scaffolds or crawl. (R. 355-362).

On April 22, 2010, plaintiff saw Paul Peterson, M.D., for evaluation of pain in her pelvis, hips, and right leg. (R. 381). Dr. Peterson noted that plaintiff's gait was impaired but that she had normal reflexes, no muscle atrophy, straight leg test was negative and that her x-rays were "unremarkable." Id. Dr. Peterson diagnosed plaintiff with sacrolitis left SI Joint, chronic low back pain, and history of both degenerative disk disease and fibromyalgia. Dr. Peterson recommended water aerobics and conservative management for sacroiliac pain. Id.

On July 9, 2010, plaintiff saw Danelle Perry, M.D., to report chest pain and that the drug Lyrica was not helping her pain. Dr. Perry assessed plaintiff with fibromyalgia, chest pain, and family history of coronary artery disease, and scheduled cardiac stress testing at a follow-up

appointment. (R. 389). On August 13, 2010, Dr. Perry completed a Medical Source Statement-Mental, which indicated that plaintiff was moderately limited in her ability to remember locations and work-like procedures, her ability to understand and remember short and simple instructions, and her ability to understand and remember detailed instructions. (R. 392-394). The statement also indicated that plaintiff was moderately limited in her ability to carry out very short and simple instructions, her ability to carry out detailed instructions, and her ability to maintain attention and concentration for extended periods. (R. 393). Also on August 13, 2010, Dr. Perry completed a Medical Source Statement-Physical, which indicated that plaintiff could frequently lift and/or carry 5 pounds; occasionally lift and/or carry 5 pounds; stand and/or walk continuously for 30 minutes; stand and/or walk 4 hours throughout an 8-hour workday with usual breaks; sit continuously for 15 minutes at one time; sit for 4 hours throughout an 8-hour day with usual breaks; push and/or pull without limitation, occasionally climb, balance, stoop, crouch, handle, finger, feel, see, speak, and hear; and never kneel or crawl. (R. 399-400). Dr. Perry's statement also noted that plaintiff's medication caused a decrease in concentration, persistence, or pace. Id. The Medical Source Statement-Physical was submitted after the ALJ's decision but before the Appeals Council ruling. (R. 395-396). Dr. Perry assessed plaintiff with hoarseness and fibromyalgia, and prescribed Savella. (R. 383).

On August 19, 2010, Manuel Jesus Calvin, M.D., reported results of previous testing, which showed high inflammation from arthritis. (R. 402). On June 29, 2011, after the ALJ hearing but before the Appeals Council ruling, Dr. Calvin completed a Medical Source Statement-Physical, which indicated that plaintiff could frequently lift and/or carry less than 5 pounds; occasionally lift and/or carry 5 pounds; stand and/or walk continuously for less than 15 minutes; stand and/or walk for 4 hours throughout an 8-hour workday with usual breaks; sit

continuously for less than 1 hour; sit for 4 hours throughout an 8-hour workday with normal breaks; push and/or pull for less than 1 hour per day; never climb, stoop, kneel, crouch, or crawl; occasionally balance, reach, handle, finger, and feel; avoid any exposure to environmental factors; and lie down or recline every 2 to 3 hours for 15 to 20 minutes at a time. (R. 9-10). Dr. Calvin noted that plaintiff's medication has the side effects of drowsiness and memory loss. Id.

### B.  Plaintiff's Testimony

During the ALJ hearing on August 23, 2010, plaintiff testified that she was unable to return to work because severe pain prevents her from sitting or standing for long periods of time. (R. 36). She has pain all over her body, but it is worst in her back. (R. 36-37). She reported having muscle spasms daily since 2007. (R. 38). Plaintiff testified that she experiences blurred vision and has reactions to medication. (R. 36). Plaintiff testified that she cannot drive for more than ten or fifteen minutes at a time, but that she will drive one or two times a week to go to the grocery store and to church. (R. 38-39). She experiences intense pain in her hips, and the only thing that gives her relief is resting with her feet up or lying in a bath or on a heating pad. (R. 39). She indicated that she lies down with her feet up six or seven times a day. (R. 39-40). Plaintiff testified that she could stand for 20 minutes before she needs to take a break, and that she can walk a block before having to take a break. Id. Plaintiff testified that she can lift about five pounds, but if she lifts more she injures her shoulder, elbow, or wrist. (R. 40-41). She has neck pain every day, which comes on from sitting down, and she has migraines two to three times per week. (R. 41-42). Plaintiff does light household chores such as dusting, she attends church, and she attends her son's football games. (R. 42-43). She can stay through a full football game if her husband drives her since she is able to take her pain medications; however, if she goes alone she can only last thirty minutes before having to leave. (R. 43). Plaintiff indicated that

she has nausea and other side effects from her medication, and that doctors have responded by prescribing different medications. (R. 44).

### C. ALJ Decision

On September 22, 2010, the ALJ made the following findings relevant to the issues before this Court: (1) plaintiff has the severe impairments of fibromyalgia, degenerative disc disease of the lumbar spine, and history of left rotator cuff tear, which have more than a minimal effect on her ability to perform basic work activities, (R. 16); (2) plaintiff has medically determinable mental impairments of history of depression and panic disorder, which when considered singly and in combination, did not cause more than minimal limitation in plaintiff's ability to perform basic mental work activities and were therefore non-severe, (R. 17); (3) plaintiff has an RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk at least 6 hours out of an 8-hour workday, and sit for at least 6 hours in an 8-hour workday, all with normal breaks and occasionally stooping. Plaintiff should avoid work above the shoulder level, id; and (4) plaintiff is capable of performing past relevant work as a customer service representative, merchandiser, and sample demonstrator, which does not require the performance of work-related activities precluded by plaintiff's RFC. Id.

### Issues

Plaintiff argues that the ALJ's Decision should be reversed for the following three reasons:

1. The ALJ failed to properly weigh the medical opinions when developing the RFC;

2. The ALJ failed to consider all of plaintiff's impairments, including her non-severe mental impairment, when developing the RFC; and

3. The ALJ failed to perform a proper credibility determination.

(Dkt. # 17 at 1-2).

## Discussion

### A.  The ALJ's Weighing of Medical Opinions

Plaintiff's first assignment of error contends that the ALJ failed to properly weigh the medical opinions when developing the RFC. (Id. at 1). Specifically, plaintiff argues that the ALJ did not give proper weight to Dr. Ring's Medical Source Statement-Physical, which indicated that plaintiff was severely limited physically and incapable of sedentary work. (Dkt. # 17 at 19) (citing R.23, 348-349). SSR 96-2p requires that a treating physician's opinion be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in the record. Robinson v. Barnhart, 366 F.3d 1078, 1081 (10th Cir. 2004). Even if a treating physician's opinion does not pass this test, it is still entitled to deference, and the ALJ must consider the following factors when assessing the weight to give it: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) supportability with relevant medical evidence; (4) consistency between the opinion and the record as a whole; (5) the physician's status as a specialist; and (6) other relevant factors brought to the attention of the ALJ. Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003).

The ALJ did not give controlling weight to Dr. Ring's Medical Source Statement-Physical, citing two reasons: (1) Dr. Ring did not have a lengthy treating relationship with plaintiff; and (2) Dr. Ring's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques. (R .23-24). The undersigned addresses the former finding first. A doctor cannot qualify as a treating physician simply because plaintiff labels him as such. Doyal v. Barnhart, 331 F.3d 758, 763 (10th Cir. 2003). However, a medical source can qualify as

a treating physician even if the source has treated a plaintiff "only a few times or only after long intervals (e.g. twice a year)…if the nature and frequency of the evaluation is typical for your condition(s)." 20 C.F.R. §§ 404.1502, 416.902. The medical record suggests that Dr. Ring did have a long-standing treating relationship with plaintiff and had clearly seen her more than "a few times." (R. 23). The record shows that Dr. Ring treated plaintiff for fibromyalgia as far back as January 9, 2003. (R. 366). The record further shows that Dr. Ring consistently treated plaintiff for pain and other symptoms during the relevant period for this case, treating her seven times from April 28, 2008 to March 29, 2010, and he filled out forms documenting plaintiff's fibromyalgia at plaintiff's request on an eighth visit. (R. 294-297, 342-349, 374-378). Dr. Ring treated plaintiff on a regular basis for almost two years prior to completing the Medical Source Statement–Physical on February 4, 2010. (R. 348-349).

The Commissioner cites Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004), to support the ALJ's finding that Dr. Ring did not qualify as a treating physician in this case. However, the facts in Randolph are much different than those here. In Randolph, the ALJ did not give controlling weight to the plaintiff's designated treating physician because the plaintiff had only visited the physician three times. See id. Additionally, the physician's notes were unpersuasive because they were little more than checked boxes on a standard form and constituted conclusory opinions. See id. Here, plaintiff saw Dr. Ring six times. Furthermore, Dr. Ring's notes are detailed, extensive, and include references to his past treating relationship with plaintiff, including observations, diagnoses, treatment options, and prescriptions. (R. 294-297, 342-344, 378). While facts such as those present here may not always be determinative of treating physician status, they are certainly more than the minimal treatment discussed in Randolph. Given plaintiff's condition, Dr. Ring's relationship with plaintiff was long enough to

rise to the level of treating physician. Dr. Ring's detailed records confirm this finding. Thus, the undersigned rejects the ALJ's determination that Dr. Ring did not have a treating relationship with plaintiff.

In addition to finding that Dr. Ring did not warrant treating physician status, the ALJ did not give controlling weight to Dr. Ring's opinion regarding plaintiff's physical impairments, because he found the opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques. (R. 24). Specifically, the ALJ opined that Dr. Ring's opinion regarding plaintiff's physical state was unreasonable, "considering her musculoskeletal and neurological examinations are largely normal." Id. Plaintiff's records show a number of normal test results or minor irregularities that conflict with Dr. Ring's opinion that plaintiff was physically incapacitated. Dr. Ring's own report in November 19, 2008, notes that plaintiff suffered "no specific joint abnormalities." (R. 295).

Results of other medically acceptable clinical and laboratory diagnostic techniques that contradicted Dr. Ring's opinion include:

- In September 2007, x-rays of plaintiff's spine were negative for major abnormalities. (R. 267, 282). In December 2007, Dr. Brooks noted that plaintiff was neurologically normal, had full muscle strength, and no pain with straight leg raising in one position, but positive in another. (R. 269).

- In April 2008, Dr. Hendricks evaluated plaintiff's back condition and noted that plaintiff had normal reflexes, no muscle atrophy, and no major abnormalities in her back, though he "perhaps" saw a "slight narrowing" at the L5-S1 level. (R. 285). Also in April 2008, after an MRI of the lumbar, Dr. Hendricks stated that plaintiff had some L4-5 abnormalities that could explain her symptoms, but he did not recommend aggressive treatment because "most of the time these annular disruptions will improve over time particularly when there is no herniation." (R. 287).

- In June 2008, Dr. Knepper examined plaintiff's x-rays and brain scan and stated that plaintiff's cervical spine and brain were negative for abnormalities. (R. 306-307).

- In October 2008, Dr. Hendricks reported that he did not think that plaintiff had a ruptured disc because she "does not have any major neurologic deficits." (R. 290). Dr. Hendricks stated that plaintiff could lift and carry up to 30 pounds, with no "excessive bending or twisting." (R. 292).

- In September 2009, Dr. Gourd stated that plaintiff had a normal gait and extremities, and no pain with straight leg raising. (R. 311-313). Plaintiff had a normal range of motion in her neck, hips, legs, shoulders, arms, and hands. (R. 314-316). His examination showed that plaintiff had no muscle atrophy and could use her hands normally. (R. 316-317).

- In April 2010, Dr. Peterson observed that plaintiff's gait was somewhat impaired, but she had no muscle atrophy, no pain with straight leg raising, and normal hip functioning. (R. 381). Dr. Peterson described plaintiff's x-rays as "unremarkable." Id.

Plaintiff contends that Dr. Ring's opinion must be given controlling weight because his opinion is consistent with objective testing that shows plaintiff suffers from fibromyalgia and arthritis. (Dkt. # 17 at 20) (citing R. 310, 313, 402). Despite the fact that Dr. Gourd opined that plaintiff's responses to tender points testing seemed to be "slightly exaggerated," (R. 313), and that exaggerated complaints of pain are not taken lightly, see Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990), the ALJ accepted plaintiff's diagnosis of fibromyalgia, finding that it constituted a severe impairment. (R. 16). However, diagnosis of a condition does not confer disability. See Bernal v. Bowen, 851 F.2d 297, 301 (10th Cir. 1988). Regarding arthritis, a test result from Dr. Calvin showing high inflammation from arthritis was submitted after the ALJ's decision but before the Appeals Council's decision. (R. 5, 402). The Appeals Council considered the test result showing arthritis, but determined the test result was not enough to overturn the ALJ's decision. (R. 1-2). Because the symptoms of arthritis are similar to those of fibromyalgia, which the ALJ determined to be a severe impairment, and because plaintiff never sought treatment for arthritis, the undersigned defers to the Appeals Council's decision not to overturn the ALJ's decision based on one test revealing arthritis. See O'Dell v. Shalala, 44 F.3d 855, 859

14

(10th Cir. 1994) (holding that when the Appeals Council accepts new evidence, the court must consider whether the ALJ's decision is still supported by substantial evidence, in light of the new evidence presented).

Furthermore, plaintiff argues that Dr. Ring's opinion should be given controlling weight because it is consistent with those of other examining doctors. (Dkt. # 17 at 20). The only doctors referenced by plaintiff are Dr. Perry, Dr. Trinidad, and Dr. Calvin. Dr. Perry submitted a physical assessment which was provided to the Appeals Council after the ALJ's decision. (R. 395-398). Dr. Perry's opinion indicates that plaintiff has extreme physical limitations. Id. However, Dr. Perry saw plaintiff on only two occasions, both of which the ALJ considered. (R. 23). On July 9, 2010, Dr. Perry saw plaintiff and noted no abnormalities apart from plaintiff's report of chest pain. (R. 389). On August 13, 2010, Dr. Perry adjusted plaintiff's medications and filled out a Medical Source Statement-Physical. (R. 383, 397-398). Dr. Perry's opinion, without more, cannot upset the substantial nature of the evidence supporting the ALJ's decision. See Odell at 858-859 (standard for evaluating evidence sent to the Appeals Council.).

As to Dr. Trinidad, plaintiff also argues that the ALJ did not give proper weight to his opinion, which plaintiff argues corroborates that of Dr. Ring. (Dkt.# 17 at 20). Dr. Trinidad examined plaintiff on two occasions in connection with a worker's compensation claim. On December 3, 2007, Dr. Trinidad examined plaintiff and opined that plaintiff suffered from "[l]umbar spine injury with right leg radiculitis…" and that she was "temporarily totally disabled." (R. 279). On July 28, 2008, Dr. Trinidad examined plaintiff and recorded the same conclusions. (R. 276). Dr. Trinidad also recommended that plaintiff be re-evaluated by Dr. Hendricks, (R .277), whose opinion the ALJ ultimately relied upon heavily. (R. 24). The ALJ gave little weight to Dr. Trinidad's opinion, stating that:

> [Dr. Trinidad]…is not a treating physician and was examined at the request of the claimant's representative…It is emphasized that the claimant underwent the examination that formed the basis of opinion in question not in an attempt to seek treatment for the symptoms, rather, through attorney referral and in connection with an effort to generate evidence for the current appeal. Further, Dr. Trinidad was presumably paid for the report and testimony. Although such evidence is certainly legitimate and deserves due consideration, the context in which it is produced cannot entirely be ignored.

(R. 23). The ALJ was within his discretion to give Dr. Trinidad's opinion little weight, since 20 C.F.R. § 404. 1502 states, "We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability." Because Dr. Trinidad did not qualify as a treating source, because his treating relationship with the patient was extremely brief, and because plaintiff visited Dr. Trinidad primarily to obtain documents for the current appeal rather than for treatment of her condition, the ALJ properly gave Dr. Trinidad's opinion little weight. (R. 23). In addition, Dr. Trinidad's opinion does not support plaintiff's argument that the ALJ erred in giving Dr. Ring's report little weight.

Plaintiff further contends that Dr. Ring's opinion should be given great weight, since plaintiff argues Dr. Ring's opinion is corroborated by the opinion of Dr. Calvin. (Dkt. # 17 at 20). On August 19, 2010, Dr. Calvin reported results of prior testing that showed plaintiff's hands to be normal, revealed no joint damage, but that did show signs of inflammatory arthritis. (R. 402). Plaintiff submitted the arthritis test result after the ALJ's decision but before the Appeals Council's decision. (R. 5). On August 1, 2011, plaintiff also submitted a Medical Source Statement-Physical from Dr. Calvin to the Appeals Council after the ALJ's decision, which plaintiff also contends corroborates the opinion of Dr. Ring, indicating extreme physical limitations. (R. 9-10). The Appeals Council noted in its decision denying plaintiff benefits that, "In looking at your case, we considered the reasons you disagree with the decision and the

additional evidence listed on the enclosed Order of the Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision." (R. 1-2). Because Dr. Calvin had a very short treating relationship with plaintiff (one visit for an exam and one visit to fill out a form), and because Dr. Calvin's report was conclusory (concluding that plaintiff has a debilitating condition based only on one test showing inflammatory arthritis), the Appeals Council was justified in upholding the ALJ's decision. Oldman v. Astrue, 509 F.3d 1254, 1259 (10th Cir. 2007) (a treating physician's report may be rejected if it is brief, conclusory, and unsupported by medical evidence).

The ALJ instead gave greater weight to consultative examiner Dr. Hendricks, who saw plaintiff four times (R. 284, 287-288, 290, 292) and whose opinion was "consistent with the medical evidence of record and the claimant was released from care." (R. 24). The ALJ also gave greater weight to the medical opinions of state agency medical doctors, Dr. Woodcock and Dr. Rodgers, because their opinions were consistent with the medical evidence. (R. 24, 334-341, 355-362); *supra* at 7.

A treating physician's opinion should generally be given more weight than that of a consultative physician and more than that of a doctor who has only reviewed the medical records. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004). If the ALJ gives less than controlling weight to a treating physician's opinion, he must explain the weight he gave the opinion and give good reasons for doing so. If he rejects the opinion, his reasons must be specific and legitimate. Watkins v. Barnhart, 350 F.3d at 1300-1301. Here, the ALJ explained the weight he gave to each medical opinion, and gave good, specific, and legitimate reasons for doing so. The ALJ therefore had discretion to give greater weight to consultative examiners and medical consultants of the State Disability Determination Services, whose opinions were supported by

objective medical evidence. SSR 96-6p. The ALJ's weighing of medical opinions is supported by substantial evidence of the record. Therefore, the undersigned affirms the ALJ regarding the weight he gave to the medical sources.

### B. RFC Assessment

Plaintiff's second assignment of error is that the ALJ failed to consider all of plaintiff's impairments, namely her non-severe mental impairment, when he developed the RFC. (Dkt. # 17 at 22). When assessing the RFC, the ALJ should consider all of the claimant's impairments, even if the impairments are labeled "non-severe." SSR 96-8p. Plaintiff does not contend that her mental limitation is severe. Therefore, the ALJ was only required to *consider*, rather than *include* plaintiff's non-severe impairment in developing the RFC. See 20 C.F.R. §§ 404.1545 (a)(2), (e); 416.945(a), (e). The ALJ did consider plaintiff's mental impairment in developing the RFC, stating, "[T]he following residual functioning capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (R. 17).

The ALJ considered all relevant medical opinions and evidence regarding plaintiff's mental limitation. (R. 21-24). The ALJ considered a Medical Source Statement-Mental prepared by Dr. Ring, which indicated a moderate limitation in remembering locations and work-like procedures, a moderate limitation in understanding and remembering short and simple instructions, a marked limitation to understand and remember detailed instructions, but no limitation in carrying out short or detailed instructions. (R. 21, 375-376). The ALJ gave little weight to Dr. Ring's opinion because he was outside his specialty of care. (R. 24). In addition, even had the ALJ given great weight to Dr. Ring's opinion, which indicated that plaintiff showed moderate limitation in *understanding* simple instructions, the result would not change since the ALJ noted that plaintiff showed no limitation in *carrying out* simple instructions. While this

result may be a close call, the undersigned gives deference to the ALJ's determination that plaintiff is fit for semi-skilled work with a Specific Vocational Preparation (SVP) of 4 as previously performed.[2]

The ALJ also considered the Medical Source Statement-Mental from Dr. Perry, which indicated a moderate limitation in the ability to remember locations and work-like procedures; understand and remember and carry out short and simple instructions; understand, remember, and carry out, detailed instructions; and maintain attention and concentration for extended periods. (R. 21, 393-394). The ALJ gave little weight to Dr. Perry's opinion since, as noted above, Dr. Perry saw plaintiff only twice, examining her on one occasion, and changing her medication and filling out Medical Source Statements on the other occasion. (R. 23, 383, 389-397). Because of the extremely short treating relationship, the ALJ was entitled to give Dr. Perry's opinion little weight.

In addition to the opinions of Dr. Ring and Dr. Perry, the ALJ considered the opinion of state disability medical consultant Dr. Varghese, who opined that plaintiff did not have a severe mental impairment, that she had mild restriction of activities of daily living, no difficulty in maintaining social functioning, no difficulty in maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 24, 320-333). The ALJ also considered consultative examiner Dr. Gourd's report, who observed that plaintiff had normal speech, clear thought processes, intact memory, and normal concentration (R. 24, 313). The ALJ also considered plaintiff's testimony (R. 18), activities (R. 22), and medical treatment (R. 22-23) in developing the RFC.

---

[2] SVP (Specific Vocational Preparation) refers to the "time required by a typical worker to learn the techniques, acquire information, and develop the facility needed for average performance in a specific job-worker situation," Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991).

On the issue of Residual Functional Capacity and the impact of non-severe impairments, the claimant has the burden of proof. See Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004). Because plaintiff did not show greater evidence of mental limitation, and the ALJ considered plaintiff's non-severe mental impairment in developing the RFC, the undersigned affirms the ALJ's RFC determination.

### C.  Credibility Analysis

Plaintiff's third and final assignment of error asserts that the ALJ performed an improper credibility analysis. (Dkt. # 17 at 23). Although the ALJ should not ignore subjective complaints, he is not obligated to believe them. See Williams v. Bowen, 844 F.2d 748, 754-755 (10th Cir. 1988). The ALJ can look to objective indicators of pain such as attempts to find relief, use of medications, regular contact with doctors, and daily activities. Luna v. Bowen, 834 F.2d 161, 165-166 (10th Cir. 1987). An ALJ's credibility findings warrant particular deference, because she is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion. White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2002). The ALJ's judgment in this respect will stand if supported by sufficient evidence. Gay v. Sullivan, 986 F.2d 1336, 1339 (10th Cir. 1993).

The ALJ found that the plaintiff's symptoms were not credible to the extent they were inconsistent with the RFC. (R.22-23). Specifically, the ALJ opined:

> The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations…she takes her son to school, to boy scout meetings, and to her parent's home. She reads her Bible everyday and socializes with others at church, at her son's boy scout meetings, and goes out to eat on a weekly basis. She does simple chores such as laundry, caring for her plants, and preparing simple meals. She goes shopping once a week in stores and shops on the computer. She can care for her own personal needs. She pays the household bills and manages the bank account (Exhibits 6E, 10E, and 8F). The claimant also reported on February 4, 2010 that

she did not want to start taking Gabapentin while taking care of her grandson, due to a possible sedating side effect (Exhibit 10F, page 1).

All medical treatment has been relatively conservative in nature, whether from the claimant's treating physicians, or the specialists who evaluated her for worker's compensation purposes (Exhibits 1F, 3F, 4F, 5F, 10F, 11F, and 16F-20F). With regard to medication side effects, although the claimant has alleged various side effects from the use of medications, the medical records, such as office treatment notes, show the claimant's medications were discontinued or adjusted accordingly.

(R. 22).

The ALJ acted within his discretion when he noted, as part of his credibility determination, that there was an absence of objective medical evidence to support plaintiff's complaints regarding the degree of bodily pain she experiences. Luna, 834, F.2d at 165 (availability of objective medical evidence is a factor the court may consider). The ALJ cited the contrast between plaintiff's assertion of disabling pain and her account of her daily activities and the objective medical record. (R. 22). The ALJ properly considered the fact that despite plaintiff's complaints of disabling pain, plaintiff did not want to start taking medication until she stopped taking care of her grandchild, since she was worried about potential side effects. (R. 22, 342). Such evidence undermines plaintiff's claim of disability. Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009) (acts inconsistent with a plaintiff's assertion of disability reflect negatively upon that plaintiff's credibility). Additionally, the ALJ properly and accurately considered plaintiff's daily activities of driving her son to school, doing basic household chores, and socializing at church. (R. 22). While an ability to complete minimal daily activities is not inconsistent with a claim that a person cannot do substantial gainful activity, see Thompson v. Sullivan, 987 F.2d 1482, 1489 (10th Cir. 1993); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983), neither is it inconsistent with a determination that one is not "preclude[d] [from] all types of work." (R. 23). Furthermore, although plaintiff repeatedly sought treatment for pain,

which bolsters her credibility, see Lawton v. Barnhart, 121 Fed. Appx. 364, 376 (10th Cir. 2005), the ALJ correctly weighed the fact that all of the treatment she received was "essentially routine and conservative in nature." (R. 22). In 2008, Dr. Hendricks recommended plaintiff undertake conservative management such as water therapy. (R. 288). Similarly, in April 2010, Dr. Peterson suggested that plaintiff follow a water aerobics plan. (R. 381).

When the ALJ sets forth specific evidence he relies on in evaluating credibility, as he did in this case, the Court should uphold the decision. Qualls v. Apfell, 206 F.3d 1368, 1372 (10th Cir. 2000). Since that determination was supported by substantial evidence, the undersigned finds that the ALJ did not commit error in making his credibility determination.

### Conclusion

Because the ALJ properly weighed the medical opinions, considered plaintiff's non-severe mental impairment when making the RFC assessment, and performed a proper credibility determination, and because his decision is supported by substantial evidence, the Court **AFFIRMS** the decision of the Commissioner denying disability benefits to plaintiff.

SO ORDERED this 12th day of July, 2013.

_____

T. Lane Wilson
United States Magistrate Judge